# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MICHAEL B. VORCE, et al.      )
       Credit Union Members  )
FCI Milan #09764-089        )
PO Box 1000                   )
Milan, MI 48160           )
                            )
       Plaintiffs,     )
                            )
                            )
      vs.                     )
                            )
                            )
LAKE MICHIGAN CREDIT UNION  )
5540 Glenwood Hills Parkway  )
Grand Rapids, MI 49512     )
                            )
       and                 )
                            )
SANDRA ("SANDY") JELINSKI   )
       Individually and in her   )
       CEO capacity         )
       Lake Michigan Credit Union )
5540 Glenwood Hills Parkway  )
Grand Rapids, MI 49512     )
                            )
       and                 )
                            )
GRETCHEN TELLMAN         )
       Individually and in her   )
       Chairperson capacity    )
       Lake Michigan Credit Union )
5540 Glenwood Hills Parkway  )
Grand Rapids, MI 49512     )
                            )
       and                 )
                            )
KENNETH LARSEN           )
       Individually and in his   )
       Vice Chairperson capacity )
       Lake Michigan Credit Union )
5540 Glenwood Hills Parkway  )
Grand Rapids, MI 49512     )
                            )
       and                 )
                            )

## 1:13-cv-132

Case No. **Robert Holmes Bell**
**U.S. District Judge**

Hon.

**COMPLAINT**



FILED (GR)
U.S. District Court Clerk

FEB 0 7 2013

By ___
Western Michigan

BRIAN BRINK                                          )
      Individually and in his            )
      Board Treasurer capacity           )
      Lake Michigan Credit Union         )
5540 Glenwood Hills Parkway                          )
Grand Rapids, MI 49512                               )
                         )
        and                          )
                         )
DAVE BARDOLPH                                        )
      Individually and in his            )
      Board Member capacity              )
      Lake Michigan Credit Union         )
5540 Glenwood Hills Parkway                          )
Grand Rapids, MI 49512                               )
                         )
        and                          )
                         )
JACK NEWBERRY                                        )
      Individually and in his            )
      Board Member capacity              )
      Lake Michigan Credit Union         )
5540 Glenwood Hills Parkway                          )
Grand Rapids, MI 49512                               )
                         )
        and                          )
                         )
CHERYL PARKER                                        )
      Individually and in her            )
      Board Member capacity              )
      Lake Michigan Credit Union         )
5540 Glenwood Hills Parkway                          )
Grand Rapids, MI 49512                               )
                         )
        and                          )
                         )
BOB PARTRIDGE                                        )
      Individually and in his            )
      Board Member capacity              )
      Lake Michigan Credit Union         )
5540 Glenwood Hills Parkway                          )
Grand Rapids, MI 49512                               )
                         )
        and                          )
                         )
MICHAEL RICE                                         )
      Individually and in his            )
      Board Member capacity              )
      Lake Michigan Credit Union         )
5540 Glenwood Hills Parkway                          )
Grand Rapids, MI 49512                               )
                         )
        and                          )

```
TOM THEORET                              )
        Individually and in his          )
        Board Member capacity            )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                   )
                                         )
        and                              )
                                         )
BILL VANPORTFLEET                        )
        Individually and in his          )
        Board Member capacity            )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                   )
                                         )
        and                              )
                                         )
BOB WHITE                                )
        Individually and in his          )
        Board Member capacity            )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                   )
                                         )
        and                              )
                                         )
BRUCE CARLSON                            )
        Individually and in his          )
        Vice President capacity          )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                   )
                                         )
        and                              )
                                         )
STEVE BUSH                               )
        Individually and in his          )
        Vice President capacity          )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                   )
                                         )
        and                              )
                                         )
SCOTT WIGGINS                            )
        Individually and in his          )
        Vice President capacity          )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                   )
                                         )
        and                              )
```

```
SHERRY RICHARDS                          )
        Individually and in her          )
        Director of Lending capacity     )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                    )
                                         )
                                         )
        and                              )
                                         )
SARA E. BEEBE                            )
        Individually and in her          )
        Lending Specialist capacity      )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                    )
                                         )
                                         )
        and                              )
                                         )
LANI LOWING                              )
        Individually and in her          )
        Lending Specialist capacity      )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                    )
                                         )
                                         )
        and                              )
                                         )
TERESA L. STEINER                        )
        Individually and in her          )
        Lending Specialist capacity      )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                    )
                                         )
                                         )
        and                              )
                                         )
JOHN AND/OR JANE DOES Nos. 1-20          )
        All of Whom are and/or Were      )
        Officers, Directors and/or       )
        Employees                        )
        Lake Michigan Credit Union       )
5540 Glenwood Hills Parkway              )
Grand Rapids, MI 49512                    )
                                         )
                                         )
        Defendants.                      )
                                         )
_____ )
```

Plaintiffs Michael B. Vorce, et al., credit union members, for their Complaint against the defendants state as follows:

## JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction as follows:

    a.   The Court has federal question jurisdiction over this case pursuant to the federal question doctrine of 28 U.S.C. § 1331 and the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.).

    b.   This Court also has supplemental and/or pendent jurisdiction over various related state law claims pursuant to 28 U.S.C. § 1367 and/or common law doctrines of pendent jurisdiction.

2.   The Court has personal jurisdiction over the defendants because they all either:

    a.   Reside in Michigan; and/or,

    b.   Have done business in Michigan in connection with the events that give rise to this lawsuit.

3.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and/or (b) based on the allegations set forth below.

4.   Plaintiffs reside and/or resided within this District at the time of the events that give rise to this lawsuit.

RELATED CASES
&
REFERENCE TO PRIOR MATTERS

5.  This case arises out of, and is related to, the same facts and circumstances that give rise to the following:

a.  That case commonly known as U.S.A. v. Vorce, sometimes also referred to as "the Criminal Case," and being more formally styled as:

United States of America v. Michael Bruce Vorce
U.S. District Court, Western District of Michigan, Southern Division
Case No. 1:08-CR-282
Judge Robert Holmes Bell

b.  The Indictment in the Criminal Case, which charged a total of 15 counts against Michael Bruce Vorce for a multi-faceted scheme to defraud various financial institutions of approximately $20,000,000.  Among other things, the indictment alleged that Vorce engaged in money laundering based on bank and wire fraud.

c.  The Amended Judgment of this Court dated 29 December 2011 and entered in the Criminal Case, which ordered Vorce to pay $3,427,440.84 in restitution for actual loss in connection with Vorce's fraud involving Lake Michigan Credit Union, among other things.

d.  The Petition dated 19 March 2012 and filed by Lake Michigan Credit Union with this Court in the Criminal Case, in which the credit union fraudulently represented material facts concerning Vorce's stock shares in Intelepeer, Inc. in order to unlawfully benefit from their liquidation.

e.    The United States of America's civil and criminal case against HSBC Bank, in which HSBC recently agreed to pay more than $1.9 billion in sanctions for its failure to monitor, examine, report and otherwise uphold its duties to combat money laundering and other criminal financial transactions as required under the Bank Secrecy Act.

f.    Various other civil racketeering suits directed against other financial institutions and their employees, including:

      i.    Stephen R. Levinson, et al. v. PSCC Services, Inc., et al. U.S. District Court, District of Connecticut Case No. 3:09-CY-00269

      ii.   Coquina Investments v. Rothstein, et al. U.S. District Court, Southern District of Florida Case No. 10-60786-Civ

g.    Numerous other civil cases that have been filed in various courts.

## PARTIES
### Plaintiffs

6.    Plaintiffs were members of Lake Michigan Credit Union at the time of the events that give rise to this lawsuit, in particular from 2006 to 2007, hereinafter also referred to as the "Members."

7.    Plaintiffs have been injured and adversely affected by the Defendants' negligence, breach of fiduciary duties, fraud, and other acts described more fully in this complaint.

8.    The interests of all current and future Lake Michigan Credit Union members are also represented by the Plaintiffs in this case.

## Defendants — In General

9.  The roles of the various defendants are outlined as follows:

    a.    **LMCU:** The federally insured credit union known as Lake Michigan Credit Union ("LMCU"). The acts and omissions of LMCU and its officers, directors, and/or employees are the principal focus of this complaint.

    b.    **LMCU Board of Directors:** Lake Michigan Credit Union Board of Directors: Sandra ("Sandy") Jelinski, CEO; Gretchen Tellman, Chairperson; Kenneth Larsen, Vice Chairperson; Brian Brink, Board Treasurer; Dave Bardolph, Board Member; Jack Newberry, Board Member; Cheryl Parker, Board Member; Bob Partridge, Board Member; Michael Rice, Board Member; Tom Theoret, Board Member; Bill Vanportfleet, Board Member; and Bob White, Board Member (collectively, the "LMCU Board"), all of whom had control of and over LMCU at all times relevant to this complaint and had a fiduciary duty to the Members.

    c.    **LMCU Managers and Employees:** Lake Michigan Credit Union managers and employees who were actively involved in administering the various accounts maintained at LMCU by Michael Vorce personally and/or by entities under his control, including but not limited to: Bruce Carlson, VP; Steve Bush, VP; Scott Wiggins, VP; Sherry Richards, Director of Lending; Sara E. Beebe, Lending Specialist; Lani Lowing, Lending Specialist; and Teresa L. Steiner, Lending Specialist. The LMCU managers and employees, insofar as Vorce's activities are concerned, acted on behalf of the LMCU Board and in keeping with the objectives and atmosphere of fraud fostered by the LMCU Board, as more fully outlined below.

     d.    **Unidentified LMCU Employees:** Other officers, directors, and/or employees of Lake Michigan Credit Union who had control of and over LMCU at times relevant to this complaint, had a fiduciary duty to the Members, and/or were actively involved in administering the various accounts maintained at LMCU by Michael Vorce personally and/or his controlled entities. The exact identities of the individual John and/or Jane Does are not yet fully known.

10.    For convenience, Lake Michigan Credit Union and all other defendants named in this complaint are sometimes collectively referred to as the "LMCU Defendants."

11.    The LMCU Defendants, through their wrongful acts and omissions as more fully described herein, have constituted a racketeering Enterprise. Said Enterprise is:

    a.    Known as the "LMCU Enterprise."

12.    In general, the LMCU Defendants, through their operation and management of the LMCU Enterprise, willingly and/or negligently allowed Vorce to use Lake Michigan Credit Union for bank fraud and money laundering, actively and/or negligently facilitated that bank fraud and money laundering because Vorce was a significant LMCU member; aided and abetted said bank fraud and money laundering; received stolen property or other wrongfully acquired property from Vorce; aided and abetted Vorce's efforts to convert stolen property; failed to file Suspicious Activity Reports ("SARs") regarding Vorce and his affairs as required by relevant banking laws, or, alternatively, filed SARs regarding Vorce but nonetheless continued to do business with him; perpetrated a fraud on this Court through material misrepresentations in order to derive a

financial benefit from Vorce's bank fraud and money laundering in conjunction with his Intelepeer, Inc. ("Intelepeer") stock shares; and generally failed to adhere to appropriate standards for federally insured credit unions and financial institutions, including but not limited to the standards of a prudent and reasonable credit union officer, director and/or employee.

[This space left intentionally blank]

Page 10

## FACTS

### Background Regarding the LMCU Defendants' Fraud

13.   Michael Vorce owned businesses in the Grand Rapids, Michigan area,
      including West Michigan Yachts, LLC ("WMY") and Barrett Bruce
      Holdings, LLC ("BBH") which he used to purchase and sell boats.

14.   In 2003, Vorce's boat business was in dire financial straits.
      Given his experience and relationships with banks, Vorce thought
      he could solve the business' financial problems if he obtained
      cash infusions.  He embarked on a scheme to eventually acquire that
      money from Lake Michigan Credit Union through loans predicated on
      dubious paperwork and transactions that went unverified.

15.   Using WMY and BBH, Vorce's scheme was to take out loans on boats
      which were non-existent, already financed, and/or not owned by Vorce,
      and use the proceeds to pay off creditors and make investments.  When
      one loan would become due, Vorce would take out another loan to pay
      off the predecessor.

16.   Between 2006 and March 2007, Vorce obtained fraudulent loans from
      Lake Michigan Credit Union totaling more than $4,700,000 directly as
      a result of the acts and omissions of the LMCU Defendants, as more
      fully outlined below.  Though the loans were purportedly for Vorce
      to purchase boats for his business, the LMCU Defendants enabled
      Vorce to transfer nearly all of the loan proceeds to his personal
      accounts at LMCU and other financial institutions, and further enabled
      Vorce's receipt of fraudulent loan proceeds at LMCU from other financial
      institutions.

17.   For reference, Vorce's bank fraud and money laundering scheme is
      sometimes referred to as "the Fraud."

18. In addition to WMY and BBH, Vorce simultaneously cofounded Intelepeer, Inc. ("Intelepeer"), an internet telephone company. Intelepeer was a money laundering vehicle for the Fraud, which Vorce initially funded using bank fraud proceeds in exchange for ownership interests that included 1,952,674 shares of common stock (the "Shares").

19. In March 2007, Vorce's scheme was uncovered. A bank group was formed that included Lake Michigan Credit Union to try and resolve debts collectively, and Vorce liquidated his assets in order to repay lenders. By the end of this process, Vorce's only remaining asset was the Shares, which the LMCU Defendants sought to maximize at any cost.

20. In April 2007, the LMCU Defendants requested that Vorce execute a certain Pledge Agreement to grant them a lien on the Shares. At that time Vorce disclosed that the Shares had in fact been obtained with proceeds from the Fraud and were thus criminally derived property which he couldn't legally convey. Nevertheless, the LMCU Defendants insisted on executing the Pledge Agreement anyway. (See Affidavit of Michael Vorce, attached as Exhibit A.)

21. Over the course of the subsequent criminal investigation in 2008, Vorce also disclosed to the government that the Shares were obtained directly with proceeds from the Fraud. (Ex. A)

22. On January 3, 2012, this Court entered a Preliminary Order of Forfeiture for Securities in the Criminal Case, which preserved the rights of LMCU to petition the Court with respect to its legal interests in the Shares. (See Dkt. 51)

23.  On March 19, 2012, the LMCU Defendants filed a Petition with this Court in which they fraudulently claimed a legal interest in the Shares, alleging "[b]y virtue of the Pledge Agreement, the Credit Union has a valid legal interest in the Subject Property" and therefore "entitled to distribution of the Subject Property." (See Petition at ¶¶12-13, p. 3, attached as Exhibit B, emphasis added.)  On information and belief, the Court relied on this material misrepresentation in granting the Petition.  In fact, LMCU never obtained a legal interest in the Shares because the LMCU Defendants knew, given Vorce's disclosure in April 2007, and at the very least should have known given other obvious evidence, that Vorce acquired the Shares with proceeds from the Fraud.

24.  As part of the government's investigation in the Criminal Case, the Department of the Treasury performed an audit of Vorce's 2003 - 2007 income, concluding that Vorce had only $106,962 in legitimate earnings in the entire six-year period.  Thus, Vorce could have only acquired the Shares with proceeds from the Fraud, which he did.  (See Form 4549-A, attached as Exhibit C.)

25.  The Members are here today because they are the victims of fraud by the LMCU Defendants and the LMCU Enterprise, first, through their wrongful acts and omissions related to the Fraud, and more recently, through their actions involving the Shares and fraudulent representations to this Court.  The Members have been victimized by the LMCU Defendants' stunning failure to properly and lawfully operate a federally insured financial institution, forced to bear the economic consequences of their misconduct which persists to this day.

Page 13

## Prior Findings & Conclusions Regarding the Fraud

26.  Pursuant to the Presentence Investigation Report ("PSR") entered in the Criminal Case, prior findings and conclusions have already been made based on reports and recommendations by the U.S. Probation Office.

27.  The findings establish that Vorce engaged in a large financial scheme to defraud, among others, Lake Michigan Credit Union in 2006 – 2007, whose members' interests are represented by the Plaintiffs, and that the amount of defrauded funds and loss amounted to millions of dollars.

28.  Among other things, the findings and conclusions further establish:

   a.  The Fraud involved "a series of loans from Lake Michigan Credit Union totaling over $4,700,000." The LMCU Defendants extended loans based on "information about 16 boats to be used as collateral, but 13 of the boats did not exist." (PSR at ¶9, p. 5)

   b.  "[T]he personal financial statements, bank statements, income tax returns, Form W-2, E*Trade accounts, securities and life insurance policy were all overstated and fraudulent...the income and assets reported on...loan applications were inflated and false, and the debt values stated were under-reported." (PSR at ¶16, p. 14)

   c.  In extending Vorce loans, the LMCU Defendants did not require supporting loan documentation and accepted Vorce's word regarding his net worth. (PSR at ¶80, p. 14)

Page 14

d.   The LMCU Defendants never checked any of the statements or financial documentation provided by Vorce to verify if he owned any of the assets listed.  (PSR at ¶79, p. 14)

e.   The LMCU Defendants extended Vorce loans based on income tax returns that were fraudulent and never filed with the IRS. The LMCU Defendants never followed through or attempted to verify any income tax returns with the IRS even though Vorce had provided written consent to do so.  (PSR at ¶¶77-78. p. 14)

f.   Vorce provided an abundance of information to the LMCU Defendants, all of which went unverified.  (PSR at ¶85, p. 15)

g.   The LMCU Defendants extended loans based on fake serial numbers that were never verified, resulting in loans for millions of dollars for boats that did not exist.  (PSR at ¶¶ 81-84, pp. 14-15)

h.   The success of the Fraud depended on continually extending new and higher dollar loans under the guise of an ever-increasing boat inventory.  The LMCU Defendants paid off existing loans with proceeds from new loans extended to Vorce, thereby increasing [the Members'] risk and exposure.  (PSR at ¶¶ 82-86, pp. 14-15)

i.   The LMCU Defendants "never requested documentation when [Vorce] told them he sold a boat.  Vorce...sometimes [said] he had traded a boat for a larger boat and would request additional financing, which he would use to retire the original loan or deposit into his checking account(s)."  (PSR at ¶86, p. 15)

j.   "Vorce obtained a $350,000.00 loan from Lake Michigan Credit Union for...a yacht...owned by [someone else]."  (PSR at ¶56, p. 11)

k.      Vorce obtained a $500,000 loan through the LMCU Defendants for
        a yacht that was already financed by Macatawa bank.  (PSR at
        ¶57, p. 11). "On August 4, 2006, [Vorce] transferred $469,842
        [of the proceeds] to his personal checking account at LaSalle
        Bank, account #4960000770."  (Indictment, p. 18)

l.      After the LMCU Defendants extended Vorce loans purportedly
        to purchase boats for his business, proceeds from said loans
        totaling $890,000 were transferred directly to Vorce's personal
        checking account at Macatawa Bank in transactions beginning
        November 7, 2006 and ending January 12, 2007.  (PSR at ¶¶ 61-63,
        p. 12)

29.  Additional facts discovered during the government's investigation in
     the Criminal Case that are material to this lawsuit include the following:

a.      "[A]t the end of 2006 Vorce wanted to finance another boat, but
        LMCU didn't want it under his personal name, so [the LMCU
        Defendants] opened a $2 million Business Line of credit under
        West Michigan Yachts, which was a first for LMCU.  When Vorce
        would need funds, he would give [the LMCU Defendants] the
        boat information and by the end of the day he would have
        money."  (See Memorandum, pp. 3, 5-6 (redacted), June 11, 2008,
        U.S. Treasury Criminal Investigation, attached as Exhibit D.)

b.      "Vorce built a...relationship with [Sara] Beebe and [Sherry]
        Richards, and...gave them gift certificates to two different
        spas.  One gift certificate, which was $250-$300 each, was to the
        Crowne Jewel Spa in Ada, and the other was for Design 1, about
        $100-$150."  "Beebe and Richards thought it was great and just
        said 'Thank You!'"  (Id. p. 3)

Page 16

c. "[D]uring late 2006, and early 2007, several changes were made to [Vorce's] loan accounts.  The first big change occurred because LMCU didn't know how to handle the boat loans.  During November 2006, there was a Federal Regulators review.  LMCU realized there were missing documents and some of the loans were 'titled' wrong...so LMCU had to change around the loan amounts and collateral; they were switching their books."  (Id., p. 5)

d. "The second big collateral change was initiated by Vorce because LMCU wanted to inspect the boats...before going to the credit board to ask for an increase.  Vorce pushed them off...so he could switch around the 'non-existing' boats with boats that did exist.  Vorce came up with 12 boats, compared the loan to value for each and then picked 5-6 to swap out.  Vorce had real collateral, which were personal boats, and he also used 3-4 boats, which were owned by [other people]...It was a massive collateral change done at once."  (Id., p. 5)

e. "Richards, LMCU VP Steve [Bush] and the Auditor were present at the inspection...Vorce showed them real boats, but on the paperwork changed the [serial number] by 1 digit.  There were times when they would make comments or question why the [serial number] was off by a digit or two and Vorce would tell them/ mention that it was a Secretary of State error or it was just being read wrong."  (Id., p. 5)

f.   "LMCU wanted to check 8 of the boats, but there [sic] were
     able to get 5.  They were fine with that, since they work on
     an 80% basis and he was at 83-84%.  After the inspection
     they were happy and while outside LMCU VP Steve [Bush] told
     Vorce that his credit was extended to $3-3.5 million."
     (Id., p. 6)

### The Enterprise and an Overview of its Racketeering Activities

30.   The Members' claims against the LMCU Defendants are based on their
operation and management of a racketeering enterprise, specifically
being the LMCU Enterprise.

31.   The racketeering enterprise was devised by the LMCU Defendants to
secure ill-gotten gains from the Fraud for themselves and/or others
associated with them, and was implemented by means of a wide array of
schemes and devices that include many fraudulent or wrongful acts and
omissions separate and apart from the Fraud.

32.   In general, the LMCU Enterprise did the following:

a.   Willingly and/or negligently facilitated the Fraud because
     it provided significant revenue to the LMCU Defendants;

b.   Aided and abetted the Fraud;

c.   Received stolen property or other wrongfully acquired property
     from the Fraud;

d.   Aided and abetted efforts to convert stolen property from
     the Fraud; and

e.   Failed to file SARs in connection with the Fraud as required by
     relevant banking laws.

33.  Some of the Fraud transactions facilitated by the LMCU Enterprise involved at least some or all of the following:

   a.  Distributing the Fraud proceeds into various accounts at LMCU and other financial institutions that had no obvious legitimate purpose.

   b.  Converting the Fraud proceeds into other forms (e.g., by converting stolen funds into other tangible assets.)

   c.  Moving the Fraud proceeds through a variety of intermediaries both inside and outside the U.S. using LMCU's banking facilities.

   d.  Some combination of all of the foregoing methods.

34.  The unlawful acts and omissions of the LMCU Defendants include, but are not limited to, acts of:

   a.  Bank fraud, in violation of 18 U.S.C. §1344.

   b.  Wire fraud, in violation of 18 U.S.C. §1343.

   c.  Receipt of converted property in violation of 18 U.S.C. §2315.

   d.  Interstate transportation of property that has been stolen, converted, or obtained by fraud, in violation of 18 U.S.C. §2314.

   e.  Money laundering, in violation of 18 U.S.C. §§1956 and/or 1957.

   f.  Fraudulent transfers, including both actual fraud and constructive fraud, in violation of the Michigan Uniform Fraudulent Transfer Act, M.C.L. §§566.31, et seq., said fraudulent transfers being supplemental to, and also part of, the money laundering activities undertaken by the LMCU Enterprise.

35.   In connection with the acts and omissions of the LMCU Defendants in particular, the transactions complained of herein are part of an ongoing pattern of:

    a.    Willingly and/or negligently allowing LMCU to be used in the Fraud and its money laundering activities;

    b.    Willfully and/or negligently failing to examine the Fraud transactions and file appropriate SARs; and

    c.    Perpetrating fraud on the Members and this Court through their willful and/or negligent material misrepresentations that subject LMCU and the Members to potential civil and criminal penalties.

### LMCU Defendants' Breach of Duties

36.   The LMCU Defendants' misconduct, as described above, was a knowing, wrongful, intentional, fraudulent, and/or reckless breach of their fiduciary duties and the standard of care owed by them as officers, directors, and/or employees of a federally insured financial institution.

### LMCU Defendants' State of Mind

37.   At all times relevant to this complaint, the LMCU Defendants:

    a.    Acted with knowing or reckless or willful disregard of the truth regarding the Fraud and/or its related transactions, or otherwise remained deliberately ignorant about such truths;

    b.    Acted with intent to unlawfully hinder, delay, or defraud other financial institutions in their efforts to recover proceeds that were wrongfully acquired through the Fraud; and/or,

    c.    Willingly aided and abetted the Fraud for reasons of their own personal gain.

38.    In addition to the above averment of intent regarding the LMCU Defendants
and the LMCU Enterprise, the following other traits also characterized
the LMCU Defendants' state of mind, either in addition to or as an
alternative to the state of mind conditions of other allegations set
forth elsewhere in his complaint:

a.    The accounts maintained by Vorce at LMCU in connection with
the Fraud represented major business for the LMCU branches in
or around Grand Rapids, Michigan, and more particularly the
branch and main office believed to be at 4027 Lake Drive SE,
Grand Rapids, Michigan, hereinafter also referred to as "the
Main Office."  (On information and belief, that branch and/or
main office has now moved to 5540 Glenwood Hills Parkway,
Grand Rapids, Michigan 49512.)

b.    The LMCU Defendants did not want to take steps to counter
the Fraud and Vorce's wrongful use of their banking facilities
for fear that:

i.    LMCU would lose significant business.

ii.    The LMCU Defendants would lose personal income, as their
compensation packages were linked in whole or in part to
the dollar value of the members they serviced, to the
dollar value of the loans they extended, to the dollar
value of the service charges levied against their members'
accounts; and/or otherwise linked to their ability to find,
enroll, service, and retain big member accounts.  These
economic considerations made the Fraud and its proceeds
valuable assets to the LMCU Defendants.

Page 21

c.    The LMCU Defendants suffered from a conflict of interest, specifically being a conflict between their legal obligations to combat and/or report the Fraud and their personal interest in retaining the Fraud accounts and proceeds, and the LMCU Defendants resolved this conflict by willingly, recklessly, and/or negligently facilitating the Fraud instead of acting to combat and/or report it.

d.    In the alternative, the conduct of the LMCU Defendants was at some or all times negligent, and/or the LMCU Defendants' negligent acts or omissions coincided with acts or omissions that were willful, characterized by deliberate ignorance of the Fraud, and/or characterized by reckless disregard or otherwise wrongful and non-negligent.

**Lake Michigan Credit Union & Vorce's Dealings with Credit Union Personnel**

39.    During the years 2006 – 2007, LMCU operated its Total Lending Center out of the Main Office.

40.    Pursuant to directions issued by the LMCU Board and in particular LMCU CEO Sandra Jelinski and LMCU Director of Lending Sherry Richards, LMCU Embarked upon a banking pattern to facilitate the Fraud, whereby:

a.    Most or all of the Fraud proceeds were deposited at LMCU's Main Office and Total Lending Center; and,

b.    The LMCU Defendants processed all of the Fraud loans, loan disbursements, checks, funds transfers, and outgoing wires through the Main Office and Total Lending Center.

41.   Due to the size and scope of the Fraud transactions at LMCU, as detailed in part below, and because of the LMCU Defendants' desire to handle the large proceeds generated by the Fraud through the Main Office and Total Lending Center, Vorce received attention from the LMCU Board and various high-level persons within LMCU.

42.   Consequently, numerous responsible personnel at LMCU were involved in, were aware of, and even affirmatively asked to be deeply involved in Vorce's dealings and transactions related to the Fraud.

43.   Among others from LMCU who provided specialized and personalized services to Vorce and the Fraud accounts, the LMCU Managers and Employees identified in ¶9c were routinely involved in the Fraud transactions:

44.   Additionally, in connection with at least some dealings, Vorce and the Fraud transactions received review and/or were implemented by approval from the LMCU Board and Sandra Jelinski, in particular the Fraud loans and transactions that exceeded $1,000,000 in the aggregate.

### Volume of the Fraud Transactions

45.   Proceeds from the Fraud in and out of the various Fraud accounts at LMCU, as detailed herein, made Vorce one of LMCU's larger and more active members.

46.   Vorce literally borrowed and moved millions of dollars in and out of the Fraud accounts at LMCU, primarily through the Main Office.

47.   By LMCU's own admissions, these transactions made Vorce LMCU's "largest commercial borrower."   (Memorandum, p. 3, Ex. E)

Page 23

48.     The Fraud accounts at times had balances well in excess of a
        million dollars.

49.     For example, in six months alone, and in just one account, specifically
        being account 0000949235, deposits from the Fraud exceeded $3 Million.

50.     In addition, the Fraud utilized other accounts at LMCU.


### The Fraud Accounts at Lake Michigan Credit Union

51.     The Fraud accounts at LMCU included at least the following:

        a.      Michael Vorce (personal)

        b.      West Michigan Yachts, LLC

        c.      Barrett Bruce Holdings, LLC

        d.      Emerson Group, LLC

        e.      Saber Marine, LLC

        f.      Saber Sales, LLC

52.     Many of the Fraud accounts were obviously business accounts that
        Vorce had a fiduciary duty to maintain for the benefit of others.

53.     The LMCU Defendants were aware of the business and/or fiduciary
        nature of some or all of the Fraud accounts under Vorce's control.


### The Transactions In Question

54.     The Fraud accounts demonstrated suspicious activity and other suspicious
        traits.

55.     Among other things, the Fraud accounts at LMCU were:

        a.      New.

        b.      Established to borrow and move large sums of money on behalf
                of newly formed entities.

    c.     Facilitating large loans and loan disbursements with no obvious or legitimate business purpose.

    d.     Unaffiliated with any known major legitimate business.

    e.     Had no known legitimate account funding sources other than proceeds from the Fraud.

56.    Additionally, Vorce was handling business accounts that involved funds that he was obviously not entitled to use for himself or for his personal benefit.

57.    Nonetheless, Vorce was using large sums under his control for his personal benefit, as further outlined below.

### *** The Large Dollar Fraud Transactions ***

58.    The sheer size and scope of the Fraud transactions were by themselves adequate to arouse suspicion and to merit great caution in handling Vorce's business, particularly in light of his obvious youth.

59.    Examples of large dollar Fraud transactions at LMCU include the following transfers OUT of the Fraud accounts at LMCU to personal accounts at banks:

**Table 1**
**Sample of Large Dollar Transfers OUT of the Fraud Accounts at LMCU**

| Account Name | Account # | Date | Amount | To Party |
|---|---|---|---|---|
| Vorce Personal | 0000949235 | 08/08/06 | $469,842 | LaSalle Bank c/o Vorce |
| Vorce Personal | 0000949235 | 11/07/06 | $240,000 | Macatawa Bank c/o Vorce |
| Vorce Personal | 0000949235 | 12/21/06 | $300,000 | Macatawa Bank c/o Vorce |
| Vorce Personal | 0000949235 | 01/12/07 | $350,000 | Macatawa Bank c/o Vorce |
| Saber Sales | | 03/25/07 | $125,000 | Macatawa Bank c/o Vorce |

60.     Examples of large dollar Fraud transactions at LMCU include the following
        transfers IN to the Fraud accounts at LMCU from banks:

### Table 2
### Sample of Large Dollar Transfers IN to the Fraud Accounts at LMCU

| Account Name | Account # | Date | Amount | From Party |
|---|---|---|---|---|
| Vorce Personal | 0000949235 | 03/27/07 | $200,135 | Independent Bank |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

(The above spaces left intentionally blank)

61.     These large dollar transactions involving transfers and deposits of
        the Fraud proceeds into the Fraud accounts at LMCU and banks, when
        added to the other facts that were known and/or obvious to the
        LMCU Defendants, were adequate to arouse suspicion, and gave the
        LMCU Defendants reason to handle Vorce's business with great caution.

62.     The Members are still investigating the Fraud transactions and anticipate
        having in the future more evidence and/or summaries of large dollar
        Fraud activities.

### *** Wire Transfers ***

63.     Wire transfer activity has been noted as a "high risk" area in
        connection with money laundering abuses, as set forth in Bank Secrecy
        Act / Anti-Money Laundering provisions.

64.     As part of his banking at LMCU in connection with the Fraud, Vorce
        routinely used wires to transfer considerable proceeds from the Fraud
        in and out of accounts.

Page 26

65.   Many of the wire transfers were also in large dollar amounts.

66.   As a sampling, the Fraud accounts and some of the transactions noted
      in Tables 1 and 2 above were involved in wires.

67.   These wire transfers were to and from the Fraud accounts at LMCU and
      other financial institutions in Michigan and throughout the country.

68.   The wire transfers frequently involved movement of the Fraud proceeds
      between disparate business and personal accounts that had no obvious
      legitimate purpose.  Examples of this phenomenon are in Tables 1 and 2.

69.   These wire transactions, when added to the other facts that were known
      and/or obvious to the LMCU Defendants, were adequate to arouse suspicion,
      and gave them reason to handle Vorce's business with great caution.

70.   The Members are still investigating the Fraud transactions at LMCU and
      anticipate having in the future more evidence and/or summaries of
      wire activities.

### *** The Offshore Transactions ***

71.   Upon information and belief, the Fraud accounts at LMCU were also
      involved in offshore transactions.

72.   Upon information and belief, these "outbound" wire transfers from
      the Fraud accounts at LMCU included the following:

**Table 3**
**Offshore Wire Transfers from the Fraud Accounts at LMCU**

| Account Name | Account # | Date | Amount | Receipt of Transfer |
|---|---|---|---|---|
| Vorce Personal | 0000949235 | | | First Curacao Int'l Bnk #01-201-303362-01 |
| Emerson Grp. | | Sept. '06 | | |
| | | | | |
| | | | | |

(The above spaces left intentionally blank)

Page 27

73.     These offshore transactions, when added to the other facts that were known and/or obvious to the LMCU Defendants, were adequate to arouse suspicion, and gave them reason to handle Vorce's business with great caution.

74.     The Members are still investigating the Fraud transactions and anticipate having in the future more evidence and/or summaries of offshore wire activities through LMCU in connection with the Fraud.

## The Bank Secrecy Act & the Responsibilities of Credit Unions

75.   As noted above, the Fraud involved the use of credit union services.

76.   Credit unions have been identified by the National Credit Union
      Administration ("NCUA") as high risk for fraud and money laundering.

77.   Credit unions' susceptibility to fraud and money laundering, and a
      credit union's duty to combat money laundering, were noted in
      NCUA Letter No. 03-CU-16, October 2003, and in the Bank Secrecy
      Act ("BSA") section of the Compliance Self Assessment Guide, which
      was attached to and made part of NCUA Letter No. 03-CU-16 (hereinafter
      collectively referred to as "Letter 03-CU-16").

78.   As stated in Letter 03-CU-16 at p. 1:

>        "Congress enacted the Bank Secrecy Act (BSA) to prevent
>        credit unions from being used as intermediaries for the
>        transfer or deposit of money derived from criminal
>        activity...The primary objective of the BSA is to provide
>        a paper trail of financial transactions to detect and prevent
>        money laundering activities connected with...elements of
>        white collar and organized crime.  Congress delegated
>        authority for issuing regulations to the Secretary of the
>        Treasury.  Credit Unions must establish and maintain a
>        written compliance program for fulfilling the requirements
>        of the BSA...Failure to comply with the requirements of
>        the BSA and its implementing regulations can result in
>        both civil and criminal penalties."  (Emphasis added.)

79.   The NCUA has also stated in Letter 03-CU-16 at p. 4:

>        "A credit union must know its members to be able to make an
>        informed decision as to the suspicious nature of a particular
>        transaction and whether to file a Suspicious Activity
>        Report (SAR).  SARs can be filed on any transaction in
>        any department."  (Emphasis added.)

80.   As "senior management," the LMCU Defendants, in particular the LMCU
      Board, have a further duty under the BSA of:

      a.      Personal compliance with all BSA requirements;

      b.      Implementing and maintaining at LMCU a system of internal controls
              to detect, prevent, and report suspicious transactions;

    c.    Making BSA compliance a condition of employment for all LMCU personnel who have contact with members, including the LMCU Defendants; and,

    d.    Ensuring that said LMCU personnel have ongoing training in new and different fraud and money laundering schemes involving credit unions.  Id.

81.    The Fraud utilized newly formed, closely held businesses in its transactions with LMCU, some of which have been set forth in ¶51.

82.    Such businesses have been identified by the Department of the Treasury as a high risk area for money laundering, by serving as conduits for distributing illegally derived income from the business to the beneficial owner of the banking account.

83.    Similar concerns regarding credit unions' susceptibility to fraud and money laundering were also noted in NCUA Letter No. 05-CU-09, June 2005 (hereinafter "Letter 05-CU-09").

84.    The Fraud's use of credit union services, including related use of newly formed, closely held businesses, when added to the other facts that were known and/or obvious to the LMCU Defendants, and pursuant to their obligations and duties under the BSA, were adequate to arouse suspicion and give the LMCU Defendants reason to handle Vorce's business with great caution.

**The Suspicious Activity, The Risk of Fraud and Money Laundering,
& the Lack of Due Diligence**

85.    The transactions presently known to the Members, as described above, should have aroused in the LMCU Defendants reasonable suspicion that Vorce was engaged in improper, illicit, and unlawful activity.

86.   Among other things, the facts and activities described above should
      have alerted a prudent and reasonable credit union officer, director,
      and/or employee to the very realistic risk that LMCU was being used
      as a conduit for the Fraud and other illicit activities.

87.   Moreover, the size of LMCU's Main Office branch, when coupled with
      the Fraud's large and unusual transactions in which LMCU personnel
      were intimately involved, means that the suspicious activities were:

      a.    Actually known to the LMCU Defendants who wielded significant
            managerial or supervisory responsibility on behalf of LMCU; or,

      b.    So obvious that the only way the LMCU Defendants could have been
            ignorant was if they deliberately chose to remain ignorant of the
            Fraud, its activities and irregularities, and the risks attendant
            thereto.

88.   Despite the facts that were known to, obvious to, and/or deliberately
      ignored by the LMCU Defendants, there is absolutely no known evidence
      that any of the LMCU Defendants undertook any meaningful efforts to:

      a.    Sufficiently and adequately follow or implement the Customer
            Identification Program ("CIP") guidelines in connection with
            Vorce and the Fraud, including but not limited to:

            i.    The CIP measures set forth in the NCUA Examiner's Guide; or,

            ii.   The CIP measures set forth in Letter 03-CU-16 and
                  Letter 05-CU-09.

      b.    Screen the Fraud transactions for fraud and money laundering, as
            would be required by banking industry norms and/or by 31 U.S.C.
            §5318(h) and related regulations appearing at 31 C.F.R. §1020.320(a)
            and at 12 C.F.R. §748, et seq.

Page 31

c.   Screen the Fraud transactions for receipt and transportation of illicitly or wrongfully acquired property.

d.   Restrict Vorce and the Fraud's use of LMCU's banking facilities.

e.   Tender to state or federal regulators any SARs about the Fraud transactions.

f.   Undertake any due diligence whatsoever to prevent Vorce from using LMCU as a conduit for the Fraud and other improper financial activities.

## The LMCU Defendants' Due Diligence Duties

89.   Under the Currency and Foreign Transactions Reporting Act (a/k/a the "Bank Secrecy Act" or "BSA"), 31 U.S.C. §5311 – 5332, and the regulations promulgated thereunder, credit unions are obligated to examine available facts regarding their customers and their business, and to otherwise devise and implement CIP protocols.  These requirements arise out of at least the following:

a.   12 C.F.R. §748.1, including but not limited to 12 C.F.R. §748.1(c)(1)(iv)(C)'s imposition on credit unions of a duty to "examin[e] the available facts, including the background and possible purpose of [a] transaction."

b.   12 C.F.R. § 748.2(b)(2)(c) and its mandate for credit unions to adopt a Bank Secrecy Act compliance program that, "shall, at a minimum," provide for internal controls to assure ongoing compliance, provide for independent testing for compliance; designate one or more individuals to coordinate and monitor day-to-day compliance, and provide for training regarding the BSA and compliance therewith.

    c.    31 C.F.R. §1020.320(a), which imposes duties on credit unions to monitor transactions for possible suspicious activities, money laundering, or other violations of law, and which also imposes via subsection (a)(2)(iii) a duty to "examin[e] the available facts, including the background and possible purpose of [a] transaction."

90. Credit unions are required to thoroughly undersand their members and their businesses to be able to distinguish routine transactions from ones that rise to the level of suspicious activity.

91. Credit unions must apply due diligence to be able to make an informed decision about the suspicious nature of a particular transaction and whether to file a SAR.

92. Among other things, these due diligence and CIP rules are meant to enable credit unions and their employees to know when and how to monitor suspicious transactions and when and how to file SARs with federal and/or state regulators and law enforcement personnel.

93. Further, credit unions are reasonably expected to exercise an even higher degree of care in light of the high risk of fraud and money laundering.

94. A credit union must ensure, through its internal audit department, outside auditors, or consultants, that it has adequate documentation for new member accounts. (Letter 03-CU-16, p. 7)

95. Pursuant to the Examiner's Guide, credit unions should review and **verify** employment, salary, bank references, financial statements, and credit reports prior to conducting large financial transactions with new member accounts, particularly the ones involved in the Fraud.

Page 33

96.  There is no evidence that _any_ of the LMCU Defendants adequately or properly exercised due diligence or CIP protocols in connection with Vorce and the Fraud transactions.

97.  Rather, all evidence points to the LMCU Defendants continuing to solicit Vorce's business, despite obvious warning signs of the Fraud, and to otherwise fail to honor the standards of a prudent and reasonable credit union officer, director, and/or employee.

## The LMCU Defendants' Compensation Package

98.  The NCUA has strongly discouraged credit union compensation plans that create inventives for employees to ignore account opening processes or possible suspicious activity.  Commissions based on the number of new member accounts or lending volume provide an incentive for officers, directors, and/or employees to neglect customer documentation requirements or other prudent account opening practices pursuant to BSA and CIP guidelines.

99.  Notwithstanding these admonitions by the NCUA, it is common practice within LMCU to link employees' compensation to factors criticized by the NCUA.

100.  On information and belief, the LMCU Defendants were compensated based in whole or in part on the Fraud transactions at LMCU.

101.  On information and belief, the LMCU Board's compensation package for its managers and employees represented a deliberate and conscious policy of encouraging personnel to actively solicit "big ticket" members, which in turn was designed to increase LMCU's overall business regardless of the nature or lawfulness of the transactions.

102. The compensation policies that are believed to have existed for the LMCU's Defendants:

    a. Encouraged employees to deliberately ignore and/or recklessly disregard proper CIP and anti-money laundering protocols in connection with "big ticket" members and their affairs, including but not necessarily limited to Vorce and the Fraud accounts; and,

    b. Amounted to a corporate custom, policy, or practice that had the inevitable, predictable, and foreseeable consequence of encouraging deliberate ignorance or reckless disregard of signs of fraud and money laundering by "big ticket" members.

### SARs and Continuing to Do Business With Vorce Despite SARs

103. Pursuant to 31 U.S.C. §5318(g) and related regulations appearing at 31 C.F.R. §1020.320(a) and 31 C.F.R. §1020.320(b), a credit union must file an SAR whenever, in connection with a customer account or banking transaction, the credit union discovers any of the broad circumstances enumerated in subsection (a)(2).

104. Among other times, credit unions must file SARs pursuant to subsection (a)(2)(iii) of said regulations if:

> "The transaction has no business or apparent lawful purpose **or** is not the sort in which the particular customer would normally be expected to engage, **and** the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction." (Emphasis added.) (Note: "Bank" is defined as, among things, "[a] credit union organized under the law of any State or the United States." Id. §1010.100(d)(6).)

Page 35

105.   Further, pursuant to subsection (a)(1) of said regulations, credit
       unions may file an SAR to report "any suspicious transaction that it
       believes is relevant to the possible violation of any law or regulation
       whose reporting is not required by...section" 1020.320(a) or 1020.320(b),
       as applicable.

106.   Similar reporting requirements are imposed by 12 C.F.R. §748.2(b)(2)(c).

107.   The Fraud activities at LMCU warranted the filing of mandatory and
       permissive SARs.

108.   There is no evidence that any of the LMCU Defendants filed any SARs
       regarding the Fraud.

109.   If the LMCU Defendants did not file SARs, then such failures or
       omissions were:

       a.     Willful and therefore indictable under the Bank Secrecy Act
              pursuant to 31 U.S.C. §5332 and therefore actionable by the
              Members as a set of predicate acts under RICO, 18 U.S.C.
              §1961(1)(E); and

       b.     Evidence of said defendants' deliberate ignorance and/or reckless
              indifference to the truth regarding the Fraud.

110.   Moreover, the LMCU Defendants' failure to monitor the Fraud transactions
       for suspicious activities, money laundering or other violations of law,
       and their failure to properly identify and know Vorce as a customer by
       examining the available facts, including the background and purpose of
       the transactions at issue, constitute indictable acts under the Bank
       Secrecy Act and are therefore predicate acts under 18 U.S.C. §1961(1)(E)
       and actionable by the Members.

## The Failure to Stop Business With Vorce and The LMCU Defendants' Complicity

111. Commencing sometime in Spring 2006 or later, the LMCU Defendants had sufficient opportunity to observe Vorce, his accounts, and the Fraud dealings in those accounts to:

   a. Know that Vorce and his dealings were tainted by wrongful activity; and/or,

   b. Reasonably suspect that Vorce and his dealings were tainted by wrongful activity.

112. Despite all that was known to, obvious to, and/or deliberately ignored by the LMCU Defendants, they continued to do business with Vorce, and took no steps to curtail the Fraud or to report it to state or federal officials.

113. The LMCU Defendants continued to do business with Vorce because the Fraud was significant and sizable business for LMCU.

114. In March 2007, the LMCU Defendants terminated Vorce as an LMCU member.

115. The LMCU Defendants did not terminate Vorce voluntarily or proactively to stop the Fraud.

116. The LMCU Defendants terminated Vorce only after:

   a. The Grand Rapids Press reported the Fraud on March 17, 2007 in connection with Macatawa Bank which led to widespread public speculation about the involvement of LMCU in the Fraud.

   b. Vorce, by and through his attorneys, disclosed the Fraud to the United States Attorney's Office in Grand Rapids, Michigan.

   c. Vorce openly discussed the Fraud with LMCU in a joint meeting on or about March 22, 2007 with other financial institutions.

Page 37

117.   Accordingly, the LMCU Defendants tolerated and accommodated the Fraud until it was:

    a.    Made public.

    b.    Known by federal law enforcement.

    c.    Known by other financial institutions which proceeded to file SARs independently, forcing the LMCU Defendants to stop business in connection with the Fraud.

### Failure to Notify Interested Parties

118.   As part of the LMCU Defendants' willful, reckless, deliberate, and/or negligent misconduct, and in addition to any acts or omissions related to the LMCU Defendants' filing and/or non-filing of SARs regarding the Fraud, the LMCU Defendants failed to take any steps to warn about, provide notice of, or otherwise disclose the Fraud and Vorce's wrongful and/or suspicious activities to any persons or entities with a legal or beneficial interest in the borrowed and/or fiduciary funds that were subject to the Fraud and Vorce's control.

## COUNT ONE - RICO and §1962(c)

119.    Plaintiffs incorporate by reference all prior allegations as if fully rewritten herein.

120.    The activities of the LMCU Enterprise as alleged herein, including the activities of the LMCU Defendants, violate the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et seq. and specifically including §1962(c).

### 1.   The Enterprise

121.    The LMCU Defendants are part of an association in fact "enterprise" within the meaning of 18 U.S.C. §1961, said enterprise being referred to herein as the LMCU Enterprise.

122.    The LMCU Defendants are part of a "union or group of individuals associated in fact" within the meaning of 18 U.S.C. §1961(4).

123.    At all relevant times, the LMCU Board controlled the LMCU Enterprise and its affairs, either through direct personal control or indirectly through persons acting on its behalf, said persons including but not limited to the LMCU Managers and Employees.

124.    All LMCU Defendants are part of the operation and/or management of the LMCU Enterprise.

125.    At the very least, the LMCU Managers and Employees were so-called "lower rung participants in the enterprise who" were "under the direction of" the LMCU Board, who were the "upper management" of the enterprise.

126.   Said acts of operation and management by the LMCU Defendants include, but are not limited to:

a.   Extending millions of dollars in loans with full knowledge, deliberate ignorance, and/or reckless disregard of the Fraud, as discussed above.

b.   Accepting and disbursing loan proceeds with full knowledge, deliberate ignorance, and/or reckless disregard of the Fraud.

c.   Providing routine checks and wire transfer services in furtherance of the Fraud and its money laundering activities.

d.   Deciding precisely how to fulfill loan requests and related banking instructions in furtherance of the Fraud.

e.   Knowingly extending millions of dollars in loans without verifying any financial or collateral information whatsoever in furtherance of the Fraud.

f.   Knowingly implementing wrongful banking transactions in furtherance of the Fraud.

g.   Generally facilitating the Fraud's use of LMCU's banking system to launder funds and to otherwise implement the Fraud, including a pattern of failing to comply with the BSA as alleged herein.

127.   Said acts of operation and management by the LMCU Defendants were the result of policies and decisions by:

a.   The LMCU Board, specifically being Sandra Jelinski and the other LMCU Board defendants named in this complaint in ¶9b, who had control of and over the LMCU Defendants at all times relevant to this complaint.

Page 40

   b.   LMCU Managers and Employees, who wielded significant managerial
        or supervisory responsibility on behalf of the LMCU Board; and/or,

   c.   The LMCU Board's conscious and deliberate choice of compensation
        policies for officers, directors, and/or employees that inevitably
        encouraged a deliberate ignoring or reckless disregarding of
        CIP protocols in connection with "big ticket" members.

128.  In addition, the LMCU Defendants operated and managed the enterprise by
      one or more of the following:

   a.   Willfully failing to file SARs;

   b.   Willfully failing to monitor the Fraud loans and transactions for
        possible fraud and suspicious activities, money laundering, or
        other violations of law;

   c.   Failing to know Vorce as a customer by examining the available
        facts, including the background and purpose of the Fraud loans
        and transactions at issue, all in violation of the Bank Secrecy
        Act and regulations promulgated thereunder; and

   d.   Willfully failing to examine any of the financial and collateral
        information provided in connection with the Fraud loans and
        transactions.

129.  These willful omissions to perform duties required by the Bank Secrecy
      Act were not part of the normal banking services in the context of a
      normal business relationship, but rather constituted affirmative illegal
      acts committed by the LMCU Defendants on their own initiative and in
      conspiracy with each other.

## 2.  The Racketeering Activity

130.  The LMCU Defendants committed acts of "racketeering activity" within the meaning of 18 U.S.C. §1961(1).

131.  The acts of racketeering complained of herein include but are not limited to:

a.  The predicate acts committed by the LMCU Defendants, including but not limited to money laundering, bank and wire fraud, receipt of converted property, and interstate transportation of stolen property, all committed through the Fraud's use of LMCU's banking facilities and the LMCU Defendants' knowing and/or deliberately ignorant complicity in these matters.

b.  The lMCU Defendants' willful violations of the Bank Secrecy Act as set forth in ¶¶88-97 herein.

c.  The LMCU Defendants' fraudulent representations to this Court in connection with the Shares as part of their willful ongoing attempt to profit from the Fraud.

### *** Bank and Wire Fraud (18 U.S.C. §§1344, 1343) ***
### The LMCU Defendants' Role

132.  The Fraud involved borrowing and moving funds through the U.S. banking system.

133.  Such funds movement included moving funds:

a.  By wires, whether as part of the processing of written checks, through wire transfers, or by other methods of moving funds through the U.S. banking system.

b.  To places beyond jurisdiction of state and federal courts in Michigan.

Page 42

    c.     From one account to another, and often from business to personal account or some combination thereof, as part of the Fraud to disguise the true source, ownership, and control of those funds.

    d.     For purposes of trying to turn dirty money into clean money, in particular by funneling the Fraud proceeds through Intelepeer, WMY, BBH, Saber Marine, Saber Sales, Emerson Group, The Wharf Marina, and one or more other entities that either had accounts at LMCU and/or received funds that were processed by and through the LMCU Defendants.

134. The Fraud could not have accomplished these funds movements unless it had unfettered access to banking facilities.

135. LMCU provided those facilities, at first on an unwitting basis and then, after having become acquainted with the Fraud, on a knowing, deliberately ignorant, or other willfully complicit basis.

136. Commencing some time in Spring 2006 or later, the LMCU Defendants' knowledge or deliberate ignorance was such that their decision to continue doing business with Vorce and his accounts was tantamount to a conscious decision to participate in the Fraud.

137. The exact dates, times, places, and amounts of the tainted bank and wire fraud transactions are either:

    a.     Already known to the LMCU Defendants by means of the banking records in their possession;

    b.     Have been partially outlined in this complaint; or,

    c.     Are extremely numerous and will be detailed in summaries prepared as this case progresses.

**\*\*\* Receipt of Converted Property (18 U.S.C. §2315) \*\*\***
**The General Background**

138.   The property subject to the Fraud was stolen, converted or unlawfully taken, or represents the proceeds of such property.

139.   The property had value in excess of $5,000, and in fact was worth many hundreds of thousands of dollars.

140.   In general, the LMCU Defendants knew that the property was stolen, converted or taken, or, alternatively, learned of its true character after receipt but nonetheless chose to continue holding such property, or, alternatively, remained deliberately or willfully ignorant about the true character of the property in question.

141.   The property was part of interstate commerce at the time it was received.

142.   Each LMCU Defendant willfully received, possessed, concealed, stored or disposed of the property after it moved in interstate commerce.


**The LMCU Defendants' Role in the Receipt of Converted Property**

143.   Much of the property that was stolen, converted, or unlawfully taken in connection with the Fraud was in the form of money.

144.   Much of that money was placed in LMCU.

145.   The LMCU deposits were into various accounts, including but not limited to the accounts set forth in Tables 1 and 2, above.

146.   Commencing some time in Spring 2006 or later, the LMCU Defendants knew or deliberately chose to ignore that the Fraud money deposited into LMCU was stolen, converted, or unlawfully taken.

147.   The LMCU Defendants' decision to willingly receive such tainted property enabled the Fraud proceeds to be stored in LMCU member accounts until they were moved elsewhere.

148.  The exact dates, times, places, and amounts of the tainted deposits are either:

    a.  Already known to the LMCU Defendants by means of the banking records in their possession; or,

    b.  Cannot be fully reconstructed due to the LMCU Defendants' own failure to comply with state and federal bank retention laws.

**\*\*\* Interstate Transportation of Stolen, Converted \*\*\***
**or Fraudulently Obtained Property (18 U.S.C. §2314)**

**The LMCU Defendants' Role in this Interstate Transportation**

149.  Much of the property that was stolen, converted, or fraudulently obtained and placed in interstate commerce in connection with the Fraud was in the form of money.

150.  Much of that money was placed in LMCU.

151.  Substantial portions of those funds were then disbursed all over the U.S., including but not limited to many of the deposits and withdrawals described elsewhere in this complaint.

152.  Commencing some time in Spring 2006 or later, the LMCU Defendants knew or deliberately chose to ignore that the money deposted into and withdrawn from LMCU was stolen, converted, or fraudulently obtained.

153.  The LMCU Defendants' decision to willingly receive and disburse such tainted property enabled the tainted funds to be moved through interstate commerce.

154.  The exact dates, times, places, and amounts of these tainted interstate banking transactions are either:

    a.  Already known to the LMCU Defendants by means of the banking records in their possession;

b.    Have been partially outlined in this complaint; or,

c.    Are extremely numerous and will be detailed in summaries prepared as this case progresses.

### *** Money Laundering (18 U.S.C. §195 and 1957) ***
### The General Background

155.    The diversion of funds in connection with the Fraud amounts to the acquisition of funds and money pursuant to specified unlawful activities ("SUAs").

156.    In particular, the acts and omissions described above were bank and wire fraud (18 U.S.C. §§1344 and 1343); receipt of converted property and/or the interstate receipt, transportation, and concealment of stolen or otherwise wrongfully acquired property (18 U.S.C. §§2314 and 2315), all of which are SUAs under both 18 U.S.C. §1956 and §1957.

157.    Further, the amounts obtained pursuant to these SUAs exceed $10,000, and in fact amounts to millions of dollars.

158.    The activities of the LMCU Defendants was designed to launder money in violation of:

a.    18 U.S.C. §1956(a)(1)(A)(i) (pertaining to conducting financial transactions involving the proceeds of an SUA with the intent to carry on an SUA);

b.    18 U.S.C. §1956(a)(1)(B)(i) (pertaining to conducting financial transactions involving proceeds of an SUA with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of an SUA);

c.     18 U.S.C. §1956(a)(2)(A) (pertaining to interstate of international transportation of monetary instruments or funds with the intent to carry on an SUA);

d.     18 U.S.C. §1956(a)(2)(B)(i) (pertaining to interstate or international transportation of monetary instruments or funds representing the proceeds of an SUA with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of an SUA);

e.     18 U.S.C. §1956(a)(3)(A) (pertaining to using the proceeds of an SUA in financial transactions intended to promote an SUA);

f.     18 U.S.C. §1956(a)(3)(B) (pertaining to using the proceeds of an SUA in financial transactions intended to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds to an SUA); and,

g.     18 U.S.C. §1957(a) (pertaining to engaging in financial transactions with the proceeds of SUAs).

### The LMCU Defendants' Role in this Money Laundering

159.   In order to conduct the money laundering described above, the Fraud needed financial intermediaries whose offices and facilities would enable large sums to be moved at whim.

160.   As part of the Fraud's use of financial intermediaries to promote and facilitate money laundering activities, much of the ill-gotten money was placed in LMCU.

161.   Substantial portions of those funds were then disbursed all over the U.S., including but not limited to may of the deposits and withdrawals described elsewhere in this complaint.

162. These deposits and disbursements involved the Fraud accounts, including but not limited to the accounts itemized in ¶51, above, and the disbursements to accounts that were partially enumerated in Table 1, above, as well as the other disbursements to:

    a.    The Fraud accounts at other financial institutions, including but not limited to:

        i.    Macatawa Bank;

        ii.    Independent Bank;

        iii.    LaSalle Bank;

        iv.    Bank of America;

        v.    Irwin Union Bank; and/or,

        vi.    Other banks;

    b.    Third-party businesses; and/or,

    c.    Third-party individuals.

163. Commencing some time in Spring 2006 or later, the LMCU Defendants knew or deliberately chose to ignore that money was being laundered through LMCU.

164. The LMCU Defendants did nothing to prevent this money laundering, and instead took steps to advance this money laundering, including but not limited to:

    a.    Making significant disbursements to Vorce and the Fraud accounts.

    b.    Executing wire transfers.

    c.    Receiving and disbursing large sums from obviously suspect activities.

    d.    Facilitating offshore transfers, which, even if they ultimately proved to be legitimate, should have acted as a "red flag,"

    e.    Failing to file SARs or, alternatively, filing SARs but nonetheless continuing their business with Vorce.

f.     Structuring their compensation packages in a way that encouraged a deliberate ignoring or reckless disregard of CIP protocols.

165.   The LMCU Defendants' decision to willingly support the Fraud enabled the implementation of at least a large part of the money laundering.

166.   The exact dates, times, places, and amounts of the money laundering transactions conducted at LMCU in connection with the Fraud are either:

a.     Already known to the LMCU Defendants by means of the banking records in their possession;

b.     Have been partially outlined in this complaint; or,

c.     Are extremely numerous and will be detailed in summaries prepared as this case progresses.

### *** BSA Violations ***
**(18 U.S.C. §1961(1)(E); 31 U.S.C. §5318; 12 C.F.R. §748.2; 31 C.F.R. §1020)**

167.   The LMCU Defendants:

a.     Failed to establish an anti-money laundering program in violation of 18 U.S.C. §5318;

b.     Failed to establish a BSA compliance program in violation of 12 C.F.R. §748.2;

c.     Failed to file required SARs in violation of 31 C.F.R. 1020.320; and/or,

d.     Filed SARs but despite such knowledge kept doing business with the Fraud when there was no valid reason to keep doing such business, as alleged in detail herein, all of which are RICO predicate acts pursuant to 18 U.S.C. §1961(1)(E).

Page 49

### 3.   The Pattern

#### The General Background and The LMCU Defendants' Role

168.   The LMCU Defendants engaged in acts of bank fraud; wire fraud; interstate transportation of stolen, converted, or fraudulently obtained property; receipt of converted property; money laundering; and BSA violations, as described above, all of which are predicate acts that constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

169.   These predicate acts were continuous, in that they commenced in or around 2006 and continue to this day through the ongoing misconduct of the LMCU Defendants.

170.   These predicate acts are related, in that each is part of the Fraud to wrongfully acquire property rightfully belonging to the Members and/or persons whose interests are represented by the Members, including current LMCU members.

171.   The LMCU Defendants' conduct also displayed continuity and relationship, in that their acts and omissions:

   a.   Provided a significant time frame of at least approximately six (6) months (and possibly more) of "closed ended continuity" that is adequate to establish the "relationship" component of a RICO pattern.

   b.   Threaten ongoing "open ended" continuity in light of their lax standards vis-a-vis the Bank Secrecy Act, thus creating a significant risk of additional wrongdoing through LMCU.

   c.   Are all related efforts to advance the wrongful objectives of the LMCU Enterprise.

### 4.  Conduct

172.  The conduct of the LMCU Enterprise consisted, at least in part, of the acts of bank and wire fraud; receipt of converted property and/or the interstate receipt, transportation, and concealment of stolen or otherwise wrongfully acquired property; and money laundering complained of herein.

### 5.  Effect on Interstate Commerce

173.  The conduct of the LMCU Enterprise affected interstate and international commerce in various ways, including but not limited to:

  a.   Routine and numerous uses of LMCU's banking facilities and wires to procure funds from LMCU and its members, banks and their stockholders, and other victims, and to thereafter divert funds to:

  i.    The LMCU Defendants.

  ii.   The Fraud accounts.

  iii.  The Fraud controlled entities.

  b.   The use of LMCU and its banking facilities to move funds through interstate commerce, as outlined above.

### 6.  The LMCU Defendants' Individual Participation

174.  Each of the LMCU Defendants engaged in the activities described herein and did individually commit two or more predicate acts (including but not limited to bank and wire fraud; receipt of converted property and/or the interstate receipt, transportation, and concealment of stolen or otherwise wrongfully acquired property; and money laundering) in furtherance of the enterprise's activities, including the acts and omissions of the LMCU Defendants.

### 7. Proximate Cause of Injury to Business and Property

175. The pattern of racketeering activity complained of above (i.e., the predicate acts described above) are the direct and proximate cause of injuries to the business and property of the Members.

176. As a direct and proximate result of the pattern of racketeering activity complained of herein, the Members have been injured in their business and property in the amount of:

   a. An estimated $3,427,440.84 or more as a result of the pattern of racketeering referred to herein.

177. Said liability should attach to all LMCU Defendants, including but not limited to the defendants specifically named in this complaint and the as yet unspecified LMCU Defendants listed as John and Jane Does.

## COUNT TWO – RICO and §1962(d)

178.    Plaintiffs incorporate by reference all prior allegations as if fully
        rewritten herein.

179.    The LMCU Defendants expressly or tacitly conspired with each other
        to advance the interests of the LMCU Enterprise.

180.    As a result of entering into said conspiracy, all of the LMCU Defendants
        are jointly and severally liable for all damages caused by the LMCU
        Enterprise, its members, and their acts and omissions.

## COUNT THREE – AIDING & ABETTING

181.    Plaintiffs incorporate by reference all prior allegations as if fully
        rewritten herein.

182.    The LMCU Defendants, through the LMCU Enterprise, aided and abetted
        the Fraud and to otherwise commit all of the other wrongs and injuries
        complained of herein.  This aiding and abetting includes: Aiding and
        abetting as a matter of substantive RICO law.

183.    As a result of said aiding and abetting, all of the LMCU Defendants
        are jointly and severally liable for all damages caused by the LMCU
        Enterprise, its members, and their acts and omissions.

## COUNT FOUR – AIDING & ABETTING FRAUD

184.    Plaintiffs incorporate by reference all prior allegations as if fully
        rewritten herein.

185.    The LMCU Defendants had knowledge of the Fraud and the Fraud-controlled
        entities, including but not limited to WMY and BBH.  In this respect, the
        LMCU Defendants had the prerequisite general awareness of the fraudulent
        and tortious conduct in connection with the Fraud.

186.  The LMCU Defendants gave substantial assistance and/or encouragement to the Fraud and the Fraud-controlled entities in carrying out the fraudulent and tortious conduct.

187.  As a result of the aforesaid conduct as enumerated in ¶¶184-186, the LMCU Defendants proximately caused damage -- and indeed caused further damage -- to the entities WMY and BBH, as well as to the persons with financial interests therein, including but not limited to the Members as well as other financial institutions.


**COUNT FIVE - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

188.  Plaintiffs incorporate by reference all prior allegations as if fully rewritten herein.

189.  The LMCU Defendants had knowledge of the breach of fiduciary duties and the breaches of trust in connection with the Fraud-controlled entities, including but not limited to WMY and BBH.  In this respect, the LMCU Defendants had the prerequisite general awareness of the tortious conduct.

190.  The LMCU Defendants gave substantial assistance and/or encouragement to the Fraud and the above-mentioned entities in carrying out the tortious conduct.

191.  As a direct result of the aforesaid conduct as enumerated in ¶¶188-190, the LMCU Defendants proximately caused damage -- and indeed caused further damage to the entities WMY and BBH, as well as to persons with property and financial interests therein, including the Members as well as other financial institutions.

## COUNT SIX – NEGLIGENCE (FEDERAL LAW DUTIES)

192.  Plaintiffs incorporate by reference all prior allegations as if fully rewritten herein.

193.  Under federal law, including but limited to the Bank Secrecy Act and related regulations, the LMCU Defendants have a duty to guard against the use of LMCU's banking facilities for fraud and money laundering or other acts designed to promote or facilitate criminal activity.

194.  These legal duties are meant to protect:

    a.    The public at large; and/or,

    b.    Other persons who do business with LMCU's members and account holders.

195.  The LMCU Defendants failed to honor their duties under federal law.

196.  The LMCU Defendants' duties caused reasonably foreseeable harm to the persons whose interests are represented by the Members.

197.  The LMCU Defendants' breaches were the result of their acts and omissions, as described more fully above.

198.  These acts and omissions, and the resulting harm, are negligence.

199.  The LMCU Defendants, including the as yet unspecified LMCU Defendants who are listed as John and Jane Does, are liable to the Members for money damages caused by their negligence.

## COUNT SEVEN – NEGLIGENCE (STATE LAW DUTIES)

200.  Plaintiffs incorporate by reference all prior allegations as if fully rewritten herein.

201.  The acts and omissions of the LMCU Defendants, including the as yet unspecified LMCU Defendants who are listed as John and Jane Does, amount to negligence based on said defendants' breach of duties under state law.

## COUNT EIGHT – BREACH OF DUTY OF GOOD FAITH

202.    Plaintiffs incorporate by reference all prior allegations as if fully rewritten herein.

203.    The LMCU Defendants, including the as yet unspecified LMCU Defendants who are listed as John and Jane Does, acted in bad faith in engaging in the acts and omissions pleaded herein, including but not limited to their dealings with and misrepresentations to this Court in connection with the Shares.

## COUNT NINE – MICHIGAN CIVIL CONSPIRACY

204.    Plaintiffs incorporate by reference all prior allegations as if fully rewritten herein.

205.    The LMCU Defendants, including the credit union itself through its agents and employees, conspired together pursuant to express and tacit agreements as well as common or implied understandings.

206.    In particular, the LMCU Defendants combined together to:

    a.      Form a malicious combination,

    b.      Of two or more persons,

    c.      That resulted in injury to the property of those persons represented by the Members, and,

    d.      Inflicted such injury pursuant to unlawful acts.

207.    Agreement and combination between the LMCU Defendants is shown by numerous facts, including but not limited to employment agreements, compensation agreements, and other facts.

Page 56

208.   The LMCU Defendants acted with at least that form of malice often referred to a "malice in law," "implied malice," "legal malice," or "imputed" or "presumed" malice.

209.   The LMCU Defendants' malice is demonstrated by one or more of the following:

    a.   The LMCU Defendants' wrongful and purposeful failure to file SARs or other comparable reports regarding the Fraud despite the numerous "red flags" associated with Vorce and the Fraud activities, as outlined elsewhere herein.

    b.   The LMCU Defendants' filing of SARs or other comparable reports but thereafter wrongfully and purposefully:

        i.   Allowing the Fraud to continue to use LMCU's premises and facilities; and/or,

        ii.   Continuing to do business with the Fraud and the Fraud-controlled entities.

    c.   The lack of any reasonable or lawful excuse for the LMCU Defendants to:

        i.   Refrain from filing SARs (or other comparable reports); and/or,

        ii.   Continue doing business with the Fraud and/or the Fraud-controlled entities after SARs were filed.

    d.   The reasonably foreseeable risk of harm to others inherent in either failing to file SARs (or other comparable reports) and/or continuing to do business with the Fraud and/or the Fraud-controlled entities after SARs were filed.

210.   Accordingly, the LMCU Defendants' acts and omissions were made and carried out in a context that plainly showed the potential for serious financial abuses and/or white collar crime.

211.  The unlawful acts involved in the conspiracy specifically include but are not limited to the following:

    a.  The LMCU Defendants' activities relative to SARs, which involved either:

        i.  The LMCU Defendants' failure to file SARs despite the numerous "red flags" associated with Vorce and the Fraud accounts, which was based on deliberate ignorance, willful blindness, and/or reckless disregard of the truth of the Fraud, as detailed elsewhere herein; or, alternatively,

        ii.  The filings of SARs but thereafter continuing to do business with the Fraud;

    b.  Allowing the Fraud to continue to use LMCU's facilities and premises despite all the external and observable indicia of the Fraud;

    c.  The Fraud's use of LMCU's facilities and premises to move money to various accounts, all of which were part of efforts to:

        i.  Wrongfully take funds belonging to persons represented by the Members and other financial institutions;

        ii.  Launder the proceeds of such wrongful takings; and,

        iii.  Fraudulently transfer assets so that the Members and other financial institutions could not recover said assets.

212.  In addition to any tacit or implicit understandings between the LMCU Defendants, there were numerous wrongful acts committed by the LMCU Defendants including but not limited to:

    a.  Aiding and abetting of the Fraud; their acts and omissions in connection with SAR filings or the lack thereof; and their negligent acts and omissions.

b.   The Fraud's wrongful and well documented misconduct, including the numerous injuries inflicted on the Members and other financial institutions.

213.   As a result of the matters cited above, the LMCU Defendants conspired together, thereby making the LMCU Defendants jointly and/or severally liable under Michigan common law and/or other sources of Michigan law for all damages caused by the Fraud.

214.   The LMCU Defendants were motivated to enter into their tacit or implied understandings because of the prospect of increased business and personal gains in connection with the Fraud.

## COUNT TEN – CONTRIBUTION & INDEMNITY

215.   Plaintiffs incorporate by reference all prior allegations as if fully rewritten herein.

216.   One or more of the entities controlled by the Fraud had liabilities to various banks whose funds were controlled, held, managed, or disposed of by said entities.

217.   The acts and omissions of the LMCU Defendants contributed in whole or in part to the banks' said liabilities.

218.   In connection with said bank liabilities, the LMCU Defendants are liable to the Members pursuant to doctrines of contribution and/or indemnity.

## PRAYER FOR RELIEF

**THEREFORE,** Plaintiffs pray for the following judgment against each and all of the LMCU Defendants:

1.     Actual damages against each of them in an amount of $3,427,440.84, said sum <u>payable to the Members excluding Vorce</u> and representing the actual loss incurred by the Members as a result of the loan proceeds stolen or otherwise misappropriated by the Fraud, with each and every LMCU Defendant liable for said amount because of their participation in the RICO conspiracy described herein, and/or because of their aiding and abetting the Fraud and/or otherwise committing the wrongful acts and omissions complained of herein.

2.     Additional actual damages against each of them in an amount to be determined by the Court payable to those banks and/or other financial institutions that suffered actual loss as a result of the Fraud, said amount equal to at least the sum total of all deposits placed into the various Fraud accounts at LMCU which derived specifically from the Fraud proceeds obtained through other banks and/or financial institutions.

3.     In connection with the Plaintiffs' RICO claim, and pursuant to 18 U.S.C. §1964(c) and/or other applicable provision of RICO, and in connection with Count 9 and pursuant to Michigan civil conspiracy law:

   a.     Any damages should be trebled.

   b.     Plaintiffs are entitled to reasonable attorney fees.

Page 60

4.  In connection with any other non—RICO counts raised by the
    Plaintiffs, any damages awarded against the relevant defendant(s)
    should be enhanced by:

    a.  An award of attorney's fees; and/or,

    b.  An award of punitive damages of not less than $5,000,000,
        said amount <u>payable to the Members excluding Vorce</u> and
        to be determined by a jury.

5.  Costs.

6.  Pre—judgment interest.

7.  Post-judgment interest.

8.  A finding or decree that all defendants are jointly and severally
    liable for any and all money damages (including trebled damages,
    punitive damages, and/or attorney fees), either under conspiracy
    theory, aiding and abetting law, or otherwise.

9.  A finding that all relief is cumulative.

10. <u>A decree that no damages and/or other relief will be awarded
    to Vorce in connection with this lawsuit.</u>

11. Any and all other relief that may be available to plaintiffs,
    excluding Vorce, at law or in equity.

## JURY DEMAND ENDORSEMENT

Plaintiffs request a trial by jury composed of the maximum number of jurors allowable by law.

Date: 02/04/2013                              Respectfully submitted,


                                              _____
                                              Michael B. Vorce
                                              Plaintiff in pro se

                                              FCI Milan
                                              Register No. 09764-089
                                              PO Box 1000
                                              Milan, MI 48160